EGAN v. SOUTHERN TOWING CO.

(District Court, D. Maryland. March 15, 1909.)

1. **Towage (§ 11*)—Care Required.**
   A master of a tug in charge of a tow, and unable because of its small size to do more than save itself in time of storm, must be very observant of the weather, and must not run risks that may be avoided, and must make for one of the numerous harbors available as soon as it becomes evident that stormy weather is to be expected.

   [Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

2. **Towage (§ 15*)—Care Required.**
   Evidence *held* to show actionable negligence of a captain of a tug in failing to take timely precautions to avoid a storm by entering a harbor with the tow.

   [Ed. Note.—For other cases, see Towage, Dec. Dig. § 15.*]

3. **Death (§ 95*)—Action for Negligent Death—Damages.**
   In libel by an administratrix for the death of her husband, 61 years old, engaged as master of a barge, a decree of $3,500 will be awarded as damages for his negligent death.

   [Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108–120; Dec. Dig. § 95.*]

4. **Death (§ 95*)—Action for Negligent Death—Damages.**
   Where a mother, suing for the negligent death of a son, had only the hope and expectation that he would contribute to her support, the court will award her $500 damages for his negligent death.

   [Ed. Note.—For other cases, see Death, Cent. Dig. §§ 108–120; Dec. Dig. § 95.*]

In Admiralty. Suit by Sarah H. Egan, administratrix, against the Southern Towing Company. Decree for plaintiff.

J. Walter Lord and Howard M. Long, for libelant.
Arthur D. Foster, for respondent.

MORRIS, District Judge (orally). This is a difficult case, as all cases are in which the court has to pass upon the correctness of the judgment of the navigator of a vessel in dealing with difficulties encountered in navigation. At the threshold of the case there are two facts which have come out very clearly.

[1] One is that it is quite in accordance with established custom for Chesapeake Bay tugs of the same class as the Dixie to undertake to tow from Baltimore to Norfolk a tow of ordinary loaded barges five in number, and often as many as eight. The other fact which is established is that such tugs—that is to say, ordinary Chesapeake Bay tugs—except in favorable weather without much adverse wind or sea are not able to manage such a tow, and against a strong wind, a heavy tide, or rough sea they are not able to move such a tow with any speed, and that in anything like a storm or anything approaching a gale such a tug has as much as it can do to save itself, so that they are not able to take a tow of five loaded barges out of danger into a

place of safety after the storm has come. One naturally asks, then, how it is that this business is carried on in the Chesapeake, as it is, very largely. It is profitable to the tug owners. It must be or it would not be conducted. It is profitable to the owners of the barges and their cargoes, and insurance is obtainable. How is that to be accounted for? Here is a business of great difficulty and danger in which tugs are undertaking to take tows which they cannot do anything with in rough water, and yet the business is continued and is a profitable business. It seems to me that can only be explained by the fact that there are, particularly along the western side of the Chesapeake, numerous harbors, most of them not distant from each other more than 10 or 15 miles, so that if the master of a tug exercises a high degree of prudence and skill—that is a degree of prudence and skill which under the circumstances is necessary for the business and without which the business could not be conducted, if he exercises that degree of care—he can always, if he is observant of the weather, get to a harbor before it is too late. If it was not for that, I do not believe the business could be conducted in the way in which it is conducted. There would have to be more powerful tugs and more seaworthy barges employed. But it is conducted, and it must be, it seems to me, only because the masters of tugs do exercise this high degree of caution which under the special circumstances is only a reasonable prudence and caution. That reasonable prudence requires of them that they shall be very observant of the weather and shall not run risks that they can avoid, and shall make for a harbor as soon as it becomes evident that stormy weather is to be expected.

[2] This brings me to the point in this case on which the decision of it turns, and that is, Was the captain of the Dixie justified in continuing on after the weather conditions became such that a storm was to be expected? The testimony is quite convincing, to my mind, that the barometer was falling and the weather indications were threatening at the time when the Dixie was passing the Piankatank River, which is a harbor, and very decidedly so when the Dixie was passing the Wolf Trap, which, while not a harbor exactly, is a place where a tug can take her tow and reach a safe anchorage, near the Wolf Trap light. She passed the Wolf Trap about 1:20 in the morning. At that time the indications certainly were alarming. The barometer at midnight had begun to go down rapidly, the wind was flawy, there were indications of a severe storm, and it seems to me on the whole testimony it was reckless not to have gone into the Wolf Trap anchorage, if not into the Piankatank Harbor. I think a reasonably prudent man would have gone into the harbor of the Piankatank.

Some criticism and animadversion is made upon those witnesses whose testimony tends to establish the early hour at which it was observable that the barometer was falling and that a storm was threatening, and that the wind was getting stronger. But Capt. Jones of the tug Dauntless acted on the opinion he formed, and sought a harbor, although he had only three barges in tow, with a more

powerful tug than the Dixie; and, whatever may be said about his testimony, there can be no doubt that he acted upon what he now says were the indications which were then present and went into harbor, and the event proved that he was right. What he says he expected to happen, did happen, a very severe storm which overwhelmed the Dixie with her tow. When the gale from the west became severe, the captain of the Dixie undertook to take his tow under the land at New Point; but his tug had not sufficient power, and he had to cut loose from the tow and save his tug. He had postponed it until too late. He had not exercised good judgment and prudence under the circumstances of the situation. Of course it is difficult after the event to place oneself in the position of the person who had to decide what to do in the face of the danger, but under the circumstances of this case, when it was so essential for a tug of that class, with very moderate power and a heavy tow, to avoid all danger, with indications showing that a storm was impending, with harbors accessible all the way along on the western shore of the bay, it seems to me that it was a fault, and more than error of judgment, in the master of the tug not to avail himself of the opportunities for reaching safety. Under the conditions under which towing can be maintained on the Chesapeake Bay it seems to me that it is more than an error of judgment, it is a fault, to neglect to avail of the opportunities which are afforded for safety.

Something has been brought out in testimony with regard to the management of the Cumminskey. That testimony is to be received with hesitation because the two men who were on board of her unfortunately were drowned, and we cannot have their statement of what occurred.

It is a close case, but the attention I have given to the testimony, and a careful consideration of it, has led me to the conclusion that the loss of the Cumminskey resulted from the neglect of the captain of the tug Dixie to take timely precautions to avoid a storm, which he ought to have known was coming from the condition of the barometer and from the appearance of the weather, all those conditions which to an experienced man would indicate that a storm was imminent.

[3, 4] Then I come to the question of the amount for which the decree ought to be entered. Capt. Egan was a man of 61 years of age. A man who earns his living in such an occupation as that of master of a barge, is not at 61 years of age in the prime of life, and the number of years in which he might be expected to earn a support for his family was limited. I think, therefore, a decree for $3,500 in respect to Capt. Egan would be right, and a decree of $500 in respect to the son is proper.

Mr. Lord: I did not catch what your honor said in regard to the son.

The Court: $500. It is not necessary for me to comment upon the peculiar circumstances in regard to him. His mother had no legal right to his earnings. She had only the hope and expectation that her son would contribute to her support.

There are other circumstances in the case that I might comment upon, but that is the·result to which I have come after consideration of the case. I desire to add that the defense of the respondent has been most ably conducted by the proctor representing the respondent.